UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| PLAINTIFF | ) | **CRIMINAL NO.: 3:02cr341 (EBB)** |
| | ) | |
| **V.** | ) | |
| | ) | |
| | ) | **September 29, 2005** |
| RICHARD BROWN | ) | |
| DEFENDANT | ) | |
| _____ | ) | |

## MOTION FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL
## AND TO ADOPT RELEVANT ARGUMENTS OF CO-DEFENDANTS

In accordance with the Federal Rules for Criminal Procedure, Rule 29(c) and Rule 33, the Defendant, **RICHARD BROWN**, hereby motions this Court for an acquittal or, in the alternative, a new trial.   In addition, the Defendant, **RICHARD BROWN**, hereby adopts the argument set forth in Co-Defendants, **ANGEL HERNANDEZ, DAVID BROWN** and/or **NELSON DATIL**'s Motion for Judgment of Acquittal and supporting memorandums as the argument and analysis therein may be relevant to him.

Pursuant to this Court's rules, a memorandum in support of this motion is attached hereto.

WHEREFORE, the Defendant prays that this Court enter a judgment of acquittal or grant the Defendant a new trial.

THE DEFENDANT
**RICHARD BROWN**

BY: _____

MICHAEL S. HILLIS
DOMBROSKI, KNAPSACK & HILLIS, LLC
205 Whitney Avenue,
New Haven, CT 06511
(203) 624-9096
Bar #: ct11867

## **CERTIFICATION**

I hereby certify that a true copy of the foregoing was mailed, postage prepaid, this 29th day of September, 2005, to the following:

**JONATHAN BIRAN**, AUSA
Office of the U.S. Attorney
P.O. Box 1824
New Haven, Connecticut 06508

**KURT ZIMMERMANN**, Esq.
Silverstein & Osach, P.C.
234 Church Street, Suite 903
New Haven, Connecticut 06510

**JONATHAN J. EINHORN**, Esq.
412 Orange Street
New Haven, Connecticut 06511

**RICHARD S. CRAMER**, Esq.
449 Silas Deane Highway
Wethersfield, Connecticut 06109

_____
MICHAEL S. HILLIS

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| PLAINTIFF | ) | CRIMINAL NO.: 3:02cr341 (EBB) |
| | ) | |
| V. | ) | |
| | ) | |
| | ) | September 29, 2005 |
| RICHARD BROWN | ) | |
| DEFENDANT | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR
## JUDGMENT OF ACQUITTAL AND FOR NEW TRIAL

The Defendant, **RICHARD BROWN**, has moved for a Judgment of Acquittal or for new

trial, pursuant to Rule 19(c) of the Federal Rules of Criminal Procedure.

I.    **FACTS**:

A.    **The Fourth Superceding Indictment**:

The Defendant, **RICHARD BROWN** was charged, by way of a Fourth Superceding

Indictment , Counts One, Eight, Eleven, Twelve, Seventeen and Eighteen, alleging violations of

18 U.S.C. §371.  The First Count alleged that he conspired with his co-defendants and others in

a scheme to defraud Mitsubishi Motors Credit Corporation ("MMCA") and others through use of

wire and mail.  The Government alleged that the defendant violated18 U.S.C. §1343 and 18

U.S.C. §2(a), 2(b) (Counts Eight, Eleven, Twelve and Seventeen), in that he committed and

-1-

aided and abetted in the commission of wire fraud: as well as, alleging that the defendant

violated 18 U.S.C. §1341 and 18 U.S.C. §2(a), 2(b) (Count Eighteen), in that he committed and

aided and abetted in the commission of mail fraud.

    **B.**    **Means and Manner of the Conspiracy**:

    The indictment states that from February 2000 and July of 2002, Shoreline Mitsubishi

and its employees, including the Defendant, **RICHARD BROWN**, engaged in a "scheme to

defraud" to obtain financial gain from MMCA and/or its customers, by rewriting customer credit

applications, which were originally produced by the customer or which was produced by the

salesperson by obtaining said information orally from the customer, and substituting otherwise

accurate information with false information in order to obtain financing approval from Mitsubishi

Motor Credit Corporation by way of a "FICO" deal.

    In addition, the Defendants were accused of using a software system instituted by

MMCA, called "Daybreak," to transmit false customer credit information into an electronic

format.   All of this alleged activity was done through the utilization of the mail and interstate

wires through private or commercial carriers.

    It was also charged that as part of the conspiracy that in an effort to induce customers,

Shoreline Mitsubishi and its employees, including the Defendant, **RICHARD BROWN**, willfully

failed to disclose the existence of large "balloon" payments, or misled customers with regard to

the terms and conditions of financing.  The Defendants allegedly failed to disclose insurance

-2-

policies and extended service contracts and would charge for optional equipment that were not installed in vehicles.   The Defendant, **RICHARD BROWN**, was among those specifically accused of taking cash down payments.

### C.    Trial and Verdict:

The trial of the Defendant, **RICHARD BROWN**, and his Co-Defendants, was held from August 10, 2005 through August 31, 2005.  The jury heard from over fifty (50) witnesses and saw scores of documents.  After nearly five (5) days of deliberations, the jury rendered a verdict on September 7, 2005.  The Defendant, **RICHARD BROWN**, was found guilty as to Counts One, Seventeen and Eighteen, and not guilty as to Counts Eight, Eleven and Twelve.

## II.    ARGUMENT:

### A.    JUDGMENT OF ACQUITTAL - STANDARD OF REVIEW

The Court "on the defendant's motion, 'must enter a judgment of **acquittal** of any offense for which the evidence is insufficient to sustain a conviction.' " United States v. Spadoni, 2005 WL 2275938 (D.Conn.) (Ruling on Defendant's Motion for Judgment of Acquittal; September 16, 2005) (Judge Burns), quoting Federal Rules of Criminal Procedure, Rule 29(a).

"A district court can enter a judgment of acquittal where the evidence is insufficient 'only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the Government's favor, it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.' " *Id.*, quoting United States v.

-3-

Reyes, 302 F.3d 48, 52 (2d Cir. 2002). " 'The jury may not be permitted to conjecture merely, or to conclude upon pure speculation...' " United States v. Taylor, 464 F.2d 240, 243 (2d Cir. 1972), quoting Curley v. United States, 160 F.2d 229, 232 (D.C.Cir. 1947).

**B.    CONSPIRACY TO COMMIT WIRE/MAIL FRAUD**

In order to prove that the Defendant, **RICHARD BROWN**, was guilty of conspiracy to commit wire and mail fraud, the Government must show proof that Brown " 'knowingly' engaged in the conspiracy with the 'specific intent to commit the offenses that were the objects of the conspiracy.' " United States v. Monaco, 194 F.3d 381, 386 (2d Cir. 1999), quoting United States v. Salameh, 152 F.3d 88, 145 (2d Cir. 1998). "Purposeful behavior" is required to establish membership in a conspiracy. See United States v. Chang An-Lo, 851 F.2d 547, 554 (2d Cir. 1988). "[M]ere association with conspirators is ... insufficient." Id.

**C.    ELEMENTS OF WIRE & MAIL FRAUD**

"The elements of mail or wire fraud are (I) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires." United States v. Autuori, 212 F.3d 105, 115 (2d Cir. 2000).

"As to the first element, the government was required to prove (I) the existence of a scheme to defraud, (ii) the requisite scienter (or fraudulent intent) on the part of the defendant and (iii) the materiality of the misrepresentations." Id. (internal citations omitted).

With regard to the second element, "[t]o show a scheme to defraud, the government

-4-

must present proof that defendants possessed a fraudulent intent." United States v. Schwartz, 924 F.2d 410 at 420 (2d Cir. 1991); United States v. Starr, 816 F.2d 94 (2d Cir. 1987). " 'Essential to a scheme to defraud is fraudulent intent.' " *Id.*, at 116, quoting United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994). "It is not sufficient that [the] defendant realizes that the scheme is fraudulent and that it has the capacity to cause harm to its victims.   Instead the proof must demonstrate that the defendant has a 'conscious knowing intent to defraud ...[and] that the defendant contemplated or intended some harm to the property rights of the victim.' " Autuori, at 116, quoting United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999) (internal citations omitted), quoting United States v. Leonard, 61 F.3d 1181, 1187 (5th Cir. 1995).  In defining "contemplated harm," the Second Circuit stressed that "when we have used that term, we have clearly meant the latter definition (to intend) rather than the former (to think about)." United States v. Gabriel, 125 F.3d 89, 97 (2d Cir. 1997).   "'Intent to defraud' means to act ... with ... *purpose* of causing some financial property loss to another." *Id.*, quoting United States v. Dinome, 86 F.3d 277, 283-284 (2d Cir. 1996).

As to the third element " '[t]o be material, the information withheld either must be some independent value or must bear on the ultimate value of the transaction.' " Autuori, at 118, quoting United States v. Mittelstaedt, 31 F.3d 1208, 1217 (2d Cir. 1994).   "The fraud statutes are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose." *Id.*

C.    **THE GOVERNMENT FAILED TO PRODUCE SUFFICIENT EVIDENCE THAT RICHARD BROWN WAS GUILTY OF CONSPIRACY TO COMMIT WIRE AND MAIL FRAUD**

The Defendant, **RICHARD BROWN**, submits that the Government failed to present

sufficient evidence that would prove that this Defendant had committed an act of wire and/or

mail fraud beyond a reasonable doubt.

In order for the Government to prove that the Defendant, **RICHARD BROWN**, was

involved in a scheme to defraud, Defendant had to possess an intent to defraud.  In

determining whether Mr. Richard Brown was a "knowing" and "willing" participant in the

conspiracy with specific intent or contemplated harm against the victims, the Court should

consider the testimony of his co-employees and cooperating witnesses who testified on behalf

of the Government.

1.    **ROLE OF SALESMAN IN SHORELINE MITSUBISHI**

a.    **Bruce Vetre**

On August 11, 2005, Bruce Vetre testified on behalf of the Government.   In his second

day of direct testimony, he described the role of a salesperson in the credit application process:

"[w]e preferred the salesperson do it.   The idea would be that they would ask the correct

questions to put in the most accurate information, and hopefully to be somewhat legible with

their handwriting." (Tr. Vol. 3, p. 56, Ln. 10-13).   He described particular salesman who he had

direct knowledge of leaving information blank, but outside of generalizing, could not identify one

transaction in which Mr. Richard Brown did. (Tr. Vol. 3, p. 57, Ln. 10-15). In fact, Mr. Vetre could not independently identify that Mr. Richard Brown committed or intended to commit fraud on any transaction, or had knowledge of the fraud even when the Government had him examine documents related to Mr. Richard Brown's transactions that he himself was involved in.

Mr. Vetre testified that primarily sales managers were responsible for the Daybreak deals at Shoreline Mitsubishi. (Tr. Vol. 2, p. 217, Ln. 3-6). He knew of two salesman who did use the system, but they were not supposed to. (Tr. Vol. 2, p. 217, Ln. 7-14). Mr. Vetre provided no direct knowledge that Mr. Richard Brown had access or ever used the daybreak system. His mere presence as an employee is not enough. In addition, the fact that at least two salesman did access the system is not enough to find that Mr. Richard Brown did utilize the daybreak system.

### b.    Jose Espinosa

On August 16 and 17, 2005, Jose Espinosa testified on behalf of the Government. Mr. Espinosa testified that as a salesman he would "[g]reet people and sell vehicles." (Tr. Vol. 5, p. 205, Ln. 4). At some point, Mr. Espinosa became a member of the finance team. (Tr. Vol. 5, p. 205, Ln. 13-17).

Mr. Espinosa explained the step by step procedure of a salesman at Shoreline: "[w]hen a customer comes in at Shoreline Mitsubishi, you get a guest sheet; you fill it out; sit down with

-7-

the customer. After that's filled out, you have their name, address, Social Security number and date of birth. You bring it to the sales desk." (Tr. Vol. 5, p. 206, Ln. 4-14). "You'd bring it up to the sales desk and give it to your sales manager who was working at the podium." (Tr. Vol. 5, p. 207, Ln. 22-23). "[Y]ou approach it to them. They will run their customer's credit bureau to see if they will qualify, see what they qualify for, what kind of vehicle they can qualify. And **they [sales managers]** will tell you where to go from there." (Tr. Vol. 5, p. 208, Ln 2-6) (Emphasis added). "**They [sales managers]** would tell you to see if they can get a cosigner. They will sit the customer back in your desk; they make the phone calls to see if they can get a cosigner to cosign for them." (Tr. Vol. 5, p. 209, Ln. 9-12) (Emphasis added). Mr. Espinosa said that salesman would go back to the customer and "talk about what kind of car they can qualify for or if they needed a cosigner, you had to get on the phone and talk to them that maybe let's make some calls and see If we can get someone to help you cosign on this loan for you." (Tr. Vol. 5, p. 209, Ln. 20-24). "You would walk to the lot and you'd show them a vehicle, give them a selection of one or two, and then bring them inside – go for a demo ride, bring them inside, and just **kind of show the manager**, listen, this is the car they want, and **they [sales managers]** will price you up in that vehicle." (Tr. Vol. 5, p. 217, Ln. 12-17) (Emphasis added).

With regard to the credit applications, Mr. Espinosa explained that "[y]ou [then] sit them down and you just kind of fill out the application with the customer at your desk. And then after

-8-

some time you bring it to you **sales manager** who was working the desk." (Tr. Vol. 5, p. 218, Ln. 18-21) (Emphasis added). "It was our job to fill out the application by hand or the customer filled the application by hand." (Tr. Vol. 5, p. 218, Ln. 24-25). The applications would contain the names, dates of birth, Social Security numbers, addresses and employment information for both the customer and the cosigner. (Tr. Vol. 5, p. 219, Ln. 19-24). After the application was brought to the sales desk, "[**t]hey [sales manager]** will .... fax it to Mitsubishi or sometimes **they** come and rewrite the application." (Tr. Vol. 5, p. 220, Ln. 21-23) (Emphasis added).

When asked whether he had direct knowledge that salesman increased income, Mr. Espinosa stated "[m]ost likely we was all in the same pot." (Tr. Vol. 5, p. 226, Ln. 15). When asked whether he had discussions with specific salesman about adding down payments to the vehicle sales price, he did not name Mr. Richard Brown.

With regard to the Daybreak system, Mr. Espinosa testified that income was changed on applications that he presented to the sales desk. (Tr. Vol. 5, p. 240, Ln. 12-15). The original applications were thrown away because they did not need them once a printed copy was made. The printed copy went directly to the finance office and that is the application that was signed by the customer in the finance office. (Tr. Vol. 5, p. 241, Ln. 1-19; Vol. 6, p. 77, Ln. 7-8).

Mr. Espinosa testified that it was the finance officers that would sell the extended warranty (Tr. Vol. 5, p. 245, Ln. 16-18). He also testified that as a salesman he would

-9-

sometimes review paperwork with the customer and have them sign, but does not recall seeing other salesman doing it (Tr. Vol. 6, p. 29, Ln. 21-25).   At the closing of a deal, "you give that to the sales manager who's working at the sales desk at the time... You will give it to the manager and **they** will finalize the deal.   **They** will print the original credit application from the Daybreak system, and they will hand it to finance and then your customer will go in to sign the final paperwork to take delivery of the vehicle."  (Tr. Vol. 6, p. 39, Ln. 12-21) (Emphasis added). The deal was increased at the Daybreak portion.  (Tr. Vol. 6, p. 39, Ln. 22-24).  Finance managers were supposed to explain the deal to the customers.  (Tr. Vol. 6, p. 77, Ln. 17-19). The finance managers would "give the salesman the licence plate and give the customer an envelope of with all the documents in it and kind of seal it, and **they** says, don't open it until two years when you come back."  (Tr. Vol. 6, p. 40, Ln. 11-14).   The salesman "don't get the papers back the manager brings that to the sales office.   Brings it to the finance office when he prints it out."  (Tr. Vol. 6, p. 78, Ln. 18-20).

Given Mr. Espinosa's explanation, how could the jury make the reasonable inference that Mr. Richard Brown was a  "knowing" and "willing" participant who knew of the fraudulent activity, when all of the fraudulent activity occurred at the manager or finance level.  The altered documentation was sent from sales desk directly to the finance office, signed by the customer, **sealed** in an envelope and given to the salesman to give to the customer.

Mr. Espinosa did testify as to specific instances of fraudulent acts of specific sales

-10-

managers and specific salesman.  He made no connection to Mr. Richard Brown, and any

specific incidents of fraudulent activity that Mr. Espinosa was a participant.  Mr. Espinosa's

testimony fails to prove that Mr. Richard Brown "knowingly" participated in the conspiracy or had

a "contemplated harm" to specific victims.    Mere presence is not enough.    Mr. Espinosa's

common knowledge is not enough to prove that Mr. Richard Brown possessed that same

knowledge.

**c.     Jose Concepcion**

On August 24, 2005, Jose Concepcion testified on behalf of the Government.   Mr.

Concepcion, a sales manager, stated that he "change[d] incomes on credit applications and/or

rental, whether they rented or owned, what their monthly payment was.  Yes, I did change

them."   (Tr. Vol. 11, p. 100, Ln. 23-25).

Mr. Concepcion testified that "credit application[s] [were] to be filled out by the customer

and/or the salesperson." (Tr. Vol. 11, p. 106, Ln. 16-17).    "[Credit Applications] were done by

the customer and/or the salesperson **only** at the first draft."  (Tr. Vol. 11, p. 107, Ln. 2-3).    The

applications "were brought to whomever was at the sales desk, whether it was myself or any

one of the other managers."  (Tr. Vol. 11, p. 107, Ln. 12-14).    Applications received from

salesman would sometimes have the income left blank or crossed out.   (Tr. Vol. 11, p. 109, Ln.

12-17).   Income was left blank so that the manager could decide how much income to put in.

(Tr. Vol. 11, p. 111, Ln. 14-16).    He testified that it "could have been any one of the

-11-

salespeople that were working there at that time." (Tr. Vol. 11, p. 112, Ln. 18-20).  He stated

that "[a]t one point or another I was given a blank credit app from one of those salespeople."

He could not recall or specify a particular incident in which Richard Brown gave him a blank

credit application.  (Tr. Vol. 11, p. 113, Ln. 11-12).

     Mr. Concepcion stated that if "a customer was declined, the salesperson was told [by

the manager] that they needed to get a cosigner for that particular customer."  (Tr. Vol. 11, p.

114, Ln. 19-22).   "**We [sales managers]** would submit it through Daybreak to see if with the

cosigner whether or not they qualified for a vehicle.   And at that time we would let the

salesperson know whether yes or no they qualified for a vehicle and what they qualified for with

the cosigner." (Tr. Vol. 11, p. 115, Ln. 5-10).

     It was clear through Mr. Concepcion that the original applications that were prepared by

the customer and/or the salesman and presented by the salesman were disposed of after the

deal was entered in Daybreak or when it got to finance.  (Tr. Vol. 11, p. 116, Ln. 1-12).  An

inference can easily be drawn that if the documents were disposed because they "did not

correspond with what was on the Daybreak system" (Tr. Vol. 11, p. 116, Ln. 7-8), it is very

possible that the information provided by the seller was accurate and was later changed by a

manager without the knowledge or intent of the salesperson.

     "[I]n terms of payments, **we [sales managers]** would give the payment from the sales

desk once we got the approval from Daybreak." (Tr. Vol. 11, p. 129, Ln. 6-8).   He specified

-12-

some salesman who did not disclose balloon payments, but could not identify Richard Brown with that failure. (Tr. Vol. 11, p. 133, Ln. 16-22). He stated that sometimes salespersons would be asked to deliver the vehicle and go over the documentation, but he did not specify which salesman or which transactions. (Tr. Vol. 11, p. 144, Ln. 5-22). He stated that he changed information on Mr. Richard Brown's applications, but he was unable to specify which transactions. (Tr. Vol. 11, p. 178, Ln. 8-10). He did not testify that Mr. Richard Brown had any knowledge of the fraudulent activity, but for Concepcion's generalization that inflating incomes was mentioned at unspecified meetings.

At the close of the car sales, Mr. Concepcion testified that the finance people would present a sealed envelope to the customer with all of the documentation inside. It was not for the salesman, but the customer. (Tr. Vol. 11, p. 228, Ln. 8-17).

Mr. Concepcion did testify as to specific instances in which he committed or he was aware of others who committed fraudulent acts. He witnessed fraudulent acts of specific sales managers and specific salesman. He made no connection to Mr. Richard Brown and/or any specific incidents of fraudulent activity that he was involved in. Mr. Concepcion's testimony fails to prove that Mr. Richard Brown "knowingly" participated in the conspiracy or had a "contemplated harm" to specific victims.

### d.    James Clanton

On August 22 and 23, 2005, James Clanton testified on behalf of the Government. Mr.

-13-

Clanton stated that "when the customer came in, I would qualify them, sit them down, and ask

them what they're looking for, what kind of car they're looking for."  (Tr. Vol. 9, p. 262, Ln. 9-

12).  He defined qualifying as "seeing where they worked, how long they have been there, what

kind of money they was making, you know, things like that.  Then I would fill out application,

credit application."  (Tr. Vol. 9, p. 262, Ln. 14-17).   It was the job of the salesman to fill out the

application and get the information about the customers employment, identifying information

and salary. (Tr. Vol. 9, p. 262, Ln. 21-25; p. 263, Ln. 10).   He would "bring it up to the desk and

bring it to the sales manager and whoever is working the desk, and they would run the credit

application, see what the score is looking like."  (Tr. Vol. 9, p. 263, Ln. 13-17).   He stated that

other salesman knew about the "minimum income," but did not specify which ones.   He stated

that the "desk would do what they had to do to get it approved."  (Tr. Vol. 9, p. 266, Ln. 2-3).

No salesman entered data in the Daybreak system.  (Tr. Vol. 10, p. 90, Ln. 10-12).   Rent

amounts were lowered "at the desk." (Tr. Vol. 9, p. 266, Ln. 11-23).  "[W]hen you go up to the

desk, you go up there with original credit application."  "It might have regular information right

on the credit application, but depending on the credit, I mean, **they [sales managers]** would

lower the rent, maybe boost the income, maybe doctor the application up a little bit to get it

approved.  Because **they [sales managers]** work the Daybreak system al day, so **they [sales**

**managers]** know what gets approved and what can't get approved."  (Tr. Vol. 9, p. 269, Ln. 8-

14) (Emphasis added).   When the application was brought to the desk "all of the information

-14-

was filled out.   I mean, nothing was really, I mean, changed until you get to the sales desk."
(Tr. Vol. 9, p. 290, Ln. 20-23).   "[A]fter you got them approved...[you] take them outside, I
mean, basically pick the car..." (Tr. Vol. 9, p. 271, Ln. 11-14).

Mr. Clanton did testify as to specific instances in which he committed or he was aware of
others who committed fraudulent acts.   He witnessed fraudulent acts of specific sales
managers and specific salesman.   He made no connection to Mr. Richard Brown, and any
specific incidents of fraudulent activity that he was involved in.   Mr. Clanton's testimony fails to
prove that Mr. Richard Brown "knowingly" participated in the conspiracy or had a "contemplated
harm" to specific victims.

**e.      Louis Pierro**

On August 19, 2005, Louis Pierro testified on behalf of the Government.   In his
testimony he indicated that he left the dealership in July of 2001, and had not worked with
Richard Brown before.   Mr. Pierro's testimony fails to prove that Mr. Richard Brown "knowingly"
participated in the conspiracy or had a "contemplated harm" to specific victims.

**2.      SATURDAY SALES MEETINGS**

**a.      Bruce Vetre**

On August 11, 2005, Bruce Vetre testified that there was at least one sales meeting
where the topics of "minimum amount" and "inflating" incomes was discussed.   (Tr. Vol. 2, p.
215, Ln. 4-19; p. 220, Ln. 18-21).   Mr. Vetre stated that this meeting occurred in the early

-15-

summer of 2002 ("I can tell you it was the summer..."), in which everyone was required to be there. (Tr. Vol. 2, p. 221, Ln. 10-17, Emphasis on Ln. 6-7 & 12).   Specifically, Mr. Vetre remembered that Angel Hernandez, Dave Brown, Manny and Richard Dominguez were present.  (Tr. Vol. 2, p. 222, Ln. 2-6).    In his second day of direct testimony, August 12, 2005, he references the same meeting as a "manager's meeting."  (Tr. Vol. 3, p. 54, Ln. 6-14).   He also conveniently changed his testimony to state that it occurred in the Spring of 2002, and he doesn't remember stating summer just hours prior. (Tr. Vol. 3, p. 122, Ln. 15-21).   As stated previously, through Ms. Alfano's testimony there was documented proof that the time frame for this meeting was beyond Mr. Richard Brown's termination of employment on May 8, 2002.   In addition, if this meeting was indeed a "manager's meeting," no salesman would be present.

#### b.    Jose Espinosa

On August 17, 2005, Mr. Espinosa testified that meetings were held on Saturdays for managers and sales consultants. (Tr. Vol. 6, p. 16, Ln 10-11).   In a weak attempt at bridging the gap to Mr. Richard Brown, the Government asked whether Richard Brown was a salesman at Shoreline when he attended the meetings, but he could not respond because he had no specific knowledge that Mr. Richard Brown was there.  (Tr. Vol. 6, p. 16, Ln. 23-25; p. 17, Ln. 12).   He recalled two meetings when Angel said "guys, if you increase income, let us know so like that we know where to go with the deal, how far we can justify the income with the bank." (Tr. Vol. 6, p. 18, Ln. 10-16).    Without recalling a specific date or month, Mr. Espinosa testified

that one of the meetings occurred before the dealership was on probation, and one occurred after. (Tr. Vol. 6, p. 21, Ln. 8-11).   He stated that the meeting occurred in 2002, but he does not recall who specifically was present. (Tr. Vol. 6, p. 59, Ln. 1-25).

### c.     Jose Concepcion

On August 23, 2005, Jose Concepcion stated that in various sales meetings and manager's meetings the topic of bumping up incomes and lowering rents were discussed.   (Tr. Vol. 11, p. 104, Ln. 7-18).   He recalled one particular one in which Angel Hernandez informed salespeople that they had to tell the mangers whether they inflated incomes so they would not also inflate the incomes. (Tr. Vol. 11, p. 119, Ln. 8-19).   He did not specify a date or time nor who was specifically was present.

### d.     James Clanton

On August 22, 2005, Mr. Clanton testified that sales meetings were held every Saturday, and all the salesman and the managers were present.  (Tr. Vol. 9, p. 291, Ln. 6-18) It was a like a "pep rally." (Tr. Vol. 9, p. 291, Ln. 12-15).   "[O]ne morning – this is when the banks started to tighten up a little bit, that Angel came in an told us to slow down on the applications, make sure all of the information on the application is right, and once we get it to the desk, then we'll make the changes that we have to make to get it approved.   **Don't change any numbers on the application**." (Tr. Vol. 9, p. 293, Ln. 10-16) (Emphasis added).   He did not specify a date or time nor who specifically was present.

-17-

### e.    Louis Pierro

On August 19, 2005, Louis Pierro testified on behalf of the Government.   In his testimony he indicated that he left the dealership in July of 2001, and had not worked with Richard Brown before.

### 3.    PROBATION STATUS OF SHORELINE MITSUBISHI

Government's Exhibit 01-15 was a letter from MMCA to Anthony Hernandez dated July 9, 2002, advising of the probation status of Shoreline Mitsubishi due to possible fraudulent activity.   This is the first official notice of fraudulent activity by MMCA to Shoreline Mitsubishi and its owner.

In response to the probation letter, Shoreline Mitsubishi, required that all employees sign an Acknowledgement of Policies and Consequences (Exhibits 01-16, 01-17) on or around July 10, 2002.   In this form, Shoreline notified employees that termination would result if anyone was found altering credit applications.   This was the only official notice given by Shoreline Mitsubishi to its employees relating specifically to fraudulent activity.   The Government failed to produce evidence that Mr. Richard Brown signed or was aware of such a notice, because the Government knew that Mr. Richard Brown had quit his employment in early May of that same year.   On August 23, 2005, Doreen Alfano, the Office Manager of Shoreline Mitsubishi, testified that Mr. Richard Brown was not even employed with Shoreline Mitsubishi after May 8, 2002 (Tr., Vol. 10, p. 195, Ln. 5-14).

**D.    THE GOVERNMENT FAILED TO PRODUCE SUFFICIENT EVIDENCE THAT
RICHARD BROWN WAS GUILTY OF WIRE AND MAIL FRAUD**

The Defendant, **RICHARD BROWN**, submits that the Government failed to present

sufficient evidence that would prove that this Defendant had committed an act of wire and/or

mail fraud beyond a reasonable doubt.   "It is not sufficient that [the] defendant realizes that the

scheme is fraudulent and that it has the capacity to cause harm to its victims.   Instead the

proof must demonstrate that the defendant has a 'conscious knowing intent to defraud ...[and]

that the defendant contemplated or intended some harm to the property rights of the victim.' "

Autuori, at 116, quoting United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999) (internal

citations omitted), quoting United States v. Leonard, 61 F.3d 1181, 1187 (5th Cir. 1995).

The Court should carefully consider the testimony of the witnesses against the

Defendant, **RICHARD BROWN**, as it relates to Counts Seventeen and Eighteen, of which the

jury found him guilty:

**1.    COUNT SEVENTEEN**

**a.    Rosa Santana**

On August 18, 2005, Rosa Santana took the witness stand on behalf of the

Government.   On direct examination, she identifies an individual known as "Diamond."   Even

through the myriad of leading questions, the Government had trouble putting "Diamond" or Mr.

Richard Brown in the context of her discussions with employees of the dealership.   Ms.

-19-

Santana stated that on Government Exhibit 17-01 (Credit Application), her employment, address and salary were correct. (Tr. Vol. 7, p. 90, Ln. 10).   She stated that Mr. Richard Brown had to check her credit, and he returned to say she did not have proper credit for the purchase. (Tr. Vol. 7, p. 88, Ln. 21-22).   She volunteered information relating to her mother (i.e. - social security number) and she was found to be credit worthy. (Tr. Vol. 7, p. 88, Ln. 24-25).   She test drove the car with her father and decided she wanted to buy the vehicle. (Tr. Vol. 7, p. 89, Ln. 13-19).   When she returned, she started signing papers (Tr. Vol. 7, p. 89, Ln. 18-22).

   The basis of the alleged fraud in this specific transaction relates to Ms. Agosto's income. As if on cue, the Government's questions shifted from "Richard Brown" or "Diamond" to "they" ("[d]id they ask questions about your mom's previous employment?" (Tr. Vol. 7, p. 91, Ln. 19-20); "What did they ask?" (Tr. Vol. 7, p. 91, Ln. 22)).   The Government attempted to rehabilitate,  ("[b]ut was it Mr. Richard Brown who you know as Diamond who was asking the questions?"), Ms. Santana replied "[t]hey said the income, and the only thing she was receiving was SSI at the time?" (Tr. Vol. 7, p. 91-92, Ln. 24-3).

   Ms. Santana testified that "they never told me [CD changer] was going to be extra charge" (Tr. Vol. 7, p. 93, Ln. 20-21), but she did not identify that it was Mr. Richard Brown who spoke with her with regard to a CD changer, nor whether she had inquired with Mr. Richard Brown about a CD Changer.   Ms. Santana did testify that "they keep on bringing papers in and out and I was just signing them."   It is unclear as to where Mr. Richard Brown was during this

-20-

process.

On cross examination, Ms. Santana revealed that a "chubby guy" with "gray hair," not Mr. Richard Brown, came out with the paperwork to have her sign the transaction documents. (Tr. Vol. 7, p. 118, Ln. 10-17).   The unidentified male had control over the paperwork and had her sign (Tr. Vol. 7, p. 119, Ln. 5-12).   She could not identify who filled out Government's Exhibit 17-01, but "[t]he [chubby] guy kept on going in and out to the office that I'm telling you about..." (Tr. Vol. 7, p. 120, Ln. 2-4).   Mr. Richard Brown was "walking around" because "it was real busy that day." (Tr. Vol. 7, p. 120, Ln. 7-9).

The Government failed to show that Mr. Richard Brown practiced any specific intent to deceive and contemplated any harm with regard to Ms. Santana or MMCA.   The nexus between information obtained through Mr. Richard Brown and the subsequent paperwork at delivery was not even remotely established.   Mr. Richard Brown collected valid information from Ms. Santana without with any knowledge, intent or contemplation of fraud.   The paperwork was prepared by another individual who had Ms. Santana sign.   There is no evidence that Mr. Richard Brown reviewed or even saw the completed paperwork during or at the conclusion of this transaction.   To find Mr. Richard Brown guilty of wire fraud for this transaction is pure speculation.

### b.    Maria Agosto

On August 18, 2005, Ms. Agosto testified on behalf of the Government.   Ms. Agosto

-21-

testified that "[t]hey took my Social Security and my licence, they took it. When they came

back, they brought papers, and I signed them." (Tr. Vol. 7, p. 210, Ln. 17-19).  She identified

"Diamond" and then stated that a "short gentleman" came out to her.  (Tr. Vol. 7, p. 211, Ln.

14).  When asked whether "Diamond" has inquired about her income, she stated "[h]e said

everything was good."  When asked if Mr. Richard Brown had inquired as to if she still worked,

she replied "[n]o, he didn't ask me anything."  (Tr. Vol. 7, p. 211, Ln. 19-20).

Absent a nexus between information obtained through Mr. Richard Brown which was

directly resulted in the fraudulent activity, the Government has failed to show that Mr. Richard

Brown had any knowledge, intent or contemplation of fraud with regard to Ms. Agosto or

MMCA.  To do so would be pure speculation.

    2.  **COUNT EIGHTEEN**

    a.  **Danielle Fowler**

On August 15, 2005, Danielle Fowler testified on behalf of the Government.  On direct

examination, Ms. Fowler testified that she knew Mr. Richard Brown prior to his employment at

Shoreline Mitsubishi.  (Tr. Vol. 4, p. 267, Ln. 2-16).   She testified that in the month prior to the

purchase, she contacted Mr. Richard Brown by telephone and verbally provided her

information, because she was not going to drive from an hour away if she did not qualify.  (Tr.

Vol. 4, p. 269, Ln. 13-24; p. 270, Ln. 3-12).  She told him that about her employer, position and

salary, which were correct on Government's Exhibit 18-01 (Credit Application) (Tr. Vol. 4, p.

271, Ln. 19-25; p. 272, Ln. 14).   She stated that Mr. Richard Brown called her back and told

her that a co-signer was required.  She first turned to her boyfriend Louis Rosado, who did not

possess sufficient credit. (Tr. Vol. 4, p. 272, Ln. 16 - p. 273, Ln. 3).   Ms. Fowler then testified

that "Chino" (Louis Rosado) told her "try my mother" and "[a]fter I talked it over with her son

[Louis Rosado], he [Louis Rosado] asked her.  They gave me the information, and I called

Richard Brown back."   (Tr. Vol. 4., p. 273, Ln. 22-25, p. 274, Ln. 1).

      Given Ms. Fowler's criminal record for obtaining money under false pretenses and

providing false information (Tr. Vol. 5, p. 23, Ln. 3-21, Emphasis on Ln. 19-21), a reasonable

inference can be made that Ms. Fowler received and/or conveyed false information from Ms.

Burgos and/or Mr. Rosado, which Mr. Richard Brown believed was perfectly legitimate and

accurate information, because "they" (Mr. Rosado and/or Ms. Burgos) believed that providing

this information would greatly assist Ms. Fowler in obtaining a vehicle she so desired.

      As with all other transactions, there still exists no nexus linking Mr. Richard Brown to the

final documentation produced at closing.   On the day she purchased the vehicle, Ms. Fowler

initially met with Mr. Richard Brown to sign the draft purchase order and the credit application

which contained the information she had provided to Mr. Richard Brown on the phone. (Tr. Vol.

4, p. 280, Ln. 15-21; p. 298, Ln. 1-14).  Ms. Fowler then entered the finance office and met with

a '"Caucasian male" who "wore glasses" (Tr. Vol. 4, p. 281, Ln. 10-16; p.293, Ln. 3-6) who was

"typing something" as she entered the finance office. (Tr. Vol. 4, p. 285, Ln. 12-18).   Mr.

-23-

Richard Brown was not present during the closing and signing of the finance documentation. (Tr. Vol. 4, p. 282, Ln. 15-25, Emphasis on Ln. 24-25). There exists a more than reasonable doubt as to whether Mr. Richard Brown had any knowledge, intent or contemplation of fraud against Ms. Fowler or MMCA with regard to this transaction.

**b.    Ana Burgos**

On August 16, 2005, Ana Burgos testified on behalf of the Government. Ms. Burgos testified that Ms. Fowler really "wanted to have a new car." (Tr. Vol. 5, p. 33, Ln. 12-16; p. 43, Ln. 16-18; p. 43, Ln. 22-25; p. 44, Ln. 1, Emphasis on p. 43-44, Ln. 25-1). She stated that she never had a conversation with anyone at Shoreline Mitsubishi, on the phone or in person, about any of her information (Tr. Vol. 5, p. 34, Ln. 1-12). She was unable to identify Richard Brown by name even she claims to have known him since 1973 (Tr. Vol. 5, p. 24, Ln. 1-7; p. 46, Ln. 4-14). She testified that Mr. Richard Brown "didn't know" that she was unemployed in all the time she has known him (Tr. Vol. 5, p. 35, Ln. 2-6; p. 37, Ln. 9-20, Emphasis on Ln. 13-16). She stated that she did not read English, but Danielle did understand Spanish. (Tr. Vol. 5, p. 40, Ln. 4-5; p. 43, Ln. 3-4). There exists a more than reasonable doubt as to whether Mr. Richard Brown had any knowledge, intent or contemplation of fraud against Ms. Burgos or MMCA with regard to this transaction.

**CONCLUSION**:

Knowledge by co-workers of fraud or commission of fraud by co-workers was not

enough for the jury to convict Richard Brown of conspiracy to commit mail and wire fraud.  The law does not support a conspiracy conviction if the evidence presented fails to show and agreement to commit fraud with another.  The Government failed to prove that Richard Brown conspired with anyone to defraud MMCA or any customers.  Moreover, the Government failed to prove, by any standard of proof,  that Richard Brown intended or contemplated financial harm to any person or entity.

In all cases like this, Courts are asked to line draw concerning sufficiency of evidence. No evidence was presented that Richard Brown knew of a conspiracy or agreed to a conspiracy to commit mail or wire fraud.  This Court is respectfully moved to acquit Mr. Richard Brown of the Counts upon which he was convicted, because the quality and quantity of proof matches those Counts upon which the jury found him not quilty.

THE DEFENDANT
**RICHARD BROWN**

BY: _____
MICHAEL S. HILLIS
DOMBROSKI, KNAPSACK & HILLIS, LLC
205 Whitney Avenue,
New Haven, CT 06511
(203) 624-9096
Bar #: ct11867

-25-

## CERTIFICATION

I hereby certify that a true copy of the foregoing was mailed, postage prepaid, this 29th day of September, 2005, to the following:

**JONATHAN BIRAN**, AUSA
Office of the U.S. Attorney
P.O. Box 1824
New Haven, Connecticut 06508

**KURT ZIMMERMANN**, Esq.
Silverstein & Osach, P.C.
234 Church Street, Suite 903
New Haven, Connecticut 06510

**JONATHAN J. EINHORN**, Esq.
412 Orange Street
New Haven, Connecticut 06511

**RICHARD S. CRAMER**, Esq.
449 Silas Deane Highway
Wethersfield, Connecticut 06109

_____
MICHAEL S. HILLIS

-26-